HOLLY S. STOBERSKI (SBN 5490)
**DUANE MORRIS LLP**
100 North City Parkway, Suite 1560
Las Vegas, NV 89106-4617
Telephone: (702) 868-2600
Facsimile: (702) 385-6862
E-Mail: hstoberski@duanemorris.com

PHILLIP K. WANG (CA 186712)
*Admitted Pro Hac Vice*
**DUANE MORRIS LLP**
One Market Plaza
Spear Street Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415.957.3000
Facsimile: 415.957.3001
E-Mail: pwang@duanemorris.com

Attorneys for Secured Creditor
WBCMT 2006-C27 PLUMAS STREET, LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA – RENO DIVISION**

| | |
|---|---|
| In re<br><br>TEE INVESTMENT COMPANY, Limited Partnership, dba LAKERIDGE APARTMENTS,<br><br>Debtor. | Case No. 3:11-BK-50615-BTB<br><br>Chapter 11 |
| WBCMT 2006-C27 PLUMAS STREET, LLC<br><br>Movant,<br><br>v.<br><br>TEE INVESTMENT COMPANY, Limited Partnership, dba LAKERIDGE APARTMENTS<br><br>Respondent. | **MOTION OF WBCMT 2006-C27 PLUMAS STREET, LLC FOR RELIEF FROM STAY PURSUANT TO 11 U.S.C. § 362(d)(1), (d)(2) AND (d)(3)**<br><br>Date:     October 25, 2011<br>Time:    10:00 a.m.<br>Place:    C. Clifton Young Federal Bldg.<br>              300 Booth Street<br>              Courtroom 2, 5th Floor<br>              Reno, NV 89509 |

Secured Creditor WBCMT 2006-C27 Plumas Street, LLC ("Movant" or "Secured Creditor"), by and through its counsel, Duane Morris LLP, hereby brings this *Motion for Relief from Stay*

DM3\1853749.3 R1501/00047

*Pursuant to 11 U.S.C. § 362(d)(1), (d)(2) and (d)(3)* (the "Motion") to allow Secured Creditor to exercise any and all of its available rights and remedies in and to its collateral, which consists of certain real property and improvements commonly known as Lakeridge Apartments West, 6155 Plumas Street, Reno, Nevada and related personal property (collectively, the "Property").

This Motion is supported by the accompanying Memorandum of Points and Authorities, the Section 362 Information Sheet required by Local Rule 4001(a)(2), the declaration of Terrence S. Daly, the Declaration of Holly S. Stoberski, and all pleadings and papers of record, and any oral argument the Court may entertain.

DATED: September 12, 2011              DUANE MORRIS LLP

By: _____
Holly S. Stoberski (SBN 5490)
Attorneys for Secured Creditor
WBCMT 2006-C27 PLUMAS STREET, LLC

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Unfortunately, there is no hope for this Debtor to be rehabilitated under the requirements of the Bankruptcy Code. As such, the Secured Creditor seeks relief from stay so that it may complete its loan enforcement remedies under state law. There are multiple reasons that are more than sufficient to lift the automatic stay, including sections 362(d)(1) (for cause), (d)(2) (lack of equity in property/not necessary to reorganization) and (d)(3) (plan does not have reasonable possibility of confirmation/payments to Secured Creditor not commenced) of the Bankruptcy Code.

Chief among those reasons, the Debtor has no reasonable chance of reorganization because it will not be able to confirm a plan. The Debtor's only significant asset is Secured Creditor's collateral, which Debtor admits has no remaining equity. Debtor seeks to favor insiders at the expense of creditors. Debtor's proposed plan of reorganization provides for a dividend to general unsecured creditors of approximately 1%, assuming not-accounted-for insider claims are subordinated. Despite the fact that unsecured creditors have only a *de minimis* distribution, the

Debtor proposes that current equity holders retain *all* of their interests. Additionally, Debtor will be unable to obtain consent for its plan from any impaired class. Although Debtor's plan purports to create a consenting impaired class, the plan would reach this end only through gerrymandering. Consequently, the plan is simply not confirmable. Providing additional cause for stay relief, Debtor's other actions prior to and throughout its bankruptcy case evidence a lack of good faith and a complete disregard for its creditors in favor of its insiders.

## II. JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) and is a contested matter pursuant to Rule 9014 of the Federal Rules of Bankruptcy Procedure.

## III. FACTUAL BACKGROUND

### A. The Secured Creditor's Claim

Secured Creditor has a duly perfected and enforceable first priority lien against substantially all of the Debtor's property, including the real property and improvements commonly known as Lakeridge Apartments West, 6155 Plumas Street, Reno, Nevada, and all rents and income generated (the "Property"). That lien secures the indebtedness under two promissory notes in the original principal amounts of $11,950,00.00 and $800,000.00 and the associated loan documents (collectively, the "Loan"). As reflected in Secured Creditor's filed proof of claim (Claim No. 5-1), the total amount due under the Loan as of the Petition Date (as hereinafter defined) is approximately $14,242,985.81. Secured Creditor believes that the fair market value of the Property is approximately $11.8 million, resulting in an estimated deficiency claim of over $2.44 million.[1] In the First Amended Disclosure Statement dated September 9, 2011 (the "Disclosure Statement")[2], the Debtor lists (i) the value of the Property at only $10 million (Disclosure Statement, ¶ 4.1), (ii) the Secured Creditor's secured claim at $14,242,985.81 (Disclosure Statement, ¶ 5.3), and (iii) the Secured Creditor's unsecured deficiency claim at $4,242,985.81 (Disclosure Statement, ¶ 5.4).

---

[1] Secured Creditor reserves all rights and arguments regarding valuation of the Property. Any dollar amounts stated herein are Secured Creditor's initial estimate, which may be revised based on appraisals, changed circumstances, or other factors, and are subject to any determination as to value that this Court may make.

[2] By the Secured Creditor's calculation, the Amended Disclosure Statement was to be filed on or before September 2, 2011. The Debtor did not file the Amended Disclosure Statement until September 9, 2011.

While these numbers obviously are inconsistent, they irrefutably establish through the Debtor's own admission in the Disclosure Statement that the Secured Creditor is undersecured and has a large deficiency claim.[3]

### B. Filing of the Petition

Debtor has not made any payments on the Loan since June 6, 2009. On February 9, 2011, Secured Creditor caused a Notice of Trustee's Sale to be recorded, which set a non-judicial foreclosure sale of the Property for March 7, 2011. Debtor filed its voluntary chapter 11 petition on the eve of foreclosure, on March 1, 2011 (the "Petition Date"). Before the Petition Date, a state court ordered a receiver (the "Receiver") to manage and operate the Property. On March 10, 2011, Secured Creditor filed its Motion To Excuse Turnover By Receiver and the Court granted that motion on May 11, 2011, permitting the Receiver to continue to manage the Property.

### C. Improper Substitution of General Partner

Debtor's general partner originally was Nathan Topol ("Topol"). In a document referred to as a "Corporation Resolution" (Docket No. 9), Debtor reveals that it has purported to replace Topol as general partner with a trust, the Nathan and Virginia Topol Trust of April 1, 1985, for which Topol is the trustee (upon information and belief, Virginia Topol is Topol's wife). (Disclosure Statement, ¶ 2.2.) The replacement of Topol as the general partner is a violation of the Loan Documents and an apparent attempt to shield Topol from personal liability. The Debtor did not give the Secured Creditor notice of this change.

### D. The Use Agreement

Among the collateral assigned to Secured Creditor is a Use Agreement ("Use Agreement") between Debtor and Lakeridge Tennis Club, Inc. (the "Tennis Club") dated June 30, 2006, pursuant to which tenants of the Debtor may use the Tennis Club's facilities in exchange for the Debtor paying $100 per month to the Tennis Club. A copy of the Use Agreement is attached as Exhibit A to the Disclosure Statement. As set forth in the Motion To Excuse The Receiver From Turnover,

---

[3] The information in the Debtor's Schedules and Statement of Financial Affairs differs from the information contained in the Disclosure Statement. The Disclosure Statement states that the information contained in the Disclosure Statement supersedes in the information contained in the Schedules and Statement of Financial Affairs. (Disclosure Statement, ¶ 1.1 at p.2.)

Secured Creditor is informed and believes that Topol and/or relatives of Topol have an interest in the Tennis Club. In particular, on page 5 of the Use Agreement, Topol signs the Use Agreement in his capacity as general partner of the Debtor and general partner of "Hillcrest Investment Company," the company that leases the tennis club facility to the Tennis Club, while a "Tamari Topol" signs the Use Agreement as president of the Tennis Club.

### E. The Debtor is Acting for the Benefit of Insiders

Debtor's Schedules show that it is continuing, post-petition, to act contrary to the interests of creditors by attempting to shield Topol and other insiders from liability at the expense of its creditors. The Debtor's Statement of Financial Affairs ("SOFA") (Withdrawals from a Partnership or Distributions by a Corporation) lists withdrawals by Topol in an "unknown amount" between March 2010 and March 2011. However, Schedule F and the Disclosure Statement both list undisputed claims by Topol in the amount of $1,090,235.79, for "entitlement expenses for tentative map and special use permits," and $299,356.90 for "contributions." Additionally, Item 21 of the Debtor's SOFA (Current Partners, Officers, Directors and Shareholders) lists Topol as one of two partners of the Debtor, but neglects to list the nature of his interest in the Debtor or the percentage interest.

Debtor's schedules and Plan also suggest that Debtor is acting for the benefit of insiders by its treatment of the Tennis Club and the Use Agreement. Debtor's Schedule F and the Disclosure Statement list an undisputed claim by the Tennis Club in the amount of $1,603,701.00, based upon "usage fees for tennis and athletic club facility," despite the fact that the Use Agreement provides that access is based upon the Debtor paying $100.00 per month.

Topol's son, Byron Topol appeared at the meeting of creditors as Debtor's representative. At that meeting, Byron Topol and Debtor's attorney acknowledged that (i) various transactions with affiliates were omitted from the Debtor's bankruptcy schedules and SOFA, and (ii) they have not conducted a thorough analysis of possible fraudulent or preferential transfers. There are no notations on the Debtor's bankruptcy schedules or SOFA to alert creditors to this missing information, and it is impossible to know what else might be undisclosed that did not happen to arise at the meeting of creditors. The Disclosure Statement lists only a single potential claim against Nathan Topol in an

unknown amount, although a footnote estimates the claim at $181,926. Preferences and fraudulent conveyances are not retained as part of the Plan.

Debtor's Schedule B lists four trucks among Debtor's personal property which, according to Schedule D, are the collateral for four automobile loans. Debtor did not turn over any of the trucks to the Receiver and the Receiver has been operating the Property for many months without the need for any of these trucks. It is unclear why a 126-unit apartment complex would require four trucks and Secured Creditor submits that these trucks are instead being used by the Topols for personal use.

F.    **The Property is in Disrepair**

In addition, Debtor has allowed the Property to fall into disrepair. It has come to the Receiver's attention that it will be necessary to make extensive repairs to the roof of the Property in order to prevent serious damage to the Property in the fall and winter months. These repairs will be costly and there is insufficient income from the Property to cover such costs. A full repair of the roof would cost between $650-700,000. Even a temporary solution to the roofing problem will cost at least $100,000.

In sum, Debtor filed for bankruptcy relief on the eve of foreclosure and is utilizing the bankruptcy process to protect and enrich its insiders at the expense of its creditors. Debtor's own schedules and Plan show the various ways in which it is acting in the best interests of the Topols and failing to maximize the value of the Property for the benefit of its creditors.

### III.    DISCUSSION.

A.    **Relief From The Automatic Stay Should Be Granted Pursuant To 11 U.S.C. § 362(d)(1)**

Under section 362(d)(1) of the Bankruptcy Code, the Court is authorized to grant relief from the automatic stay "for cause," including, without limitation, the lack of adequate protection of a party's interest in property. 11 U.S.C. § 362(d)(1). The decision of whether to lift the stay for cause under section 362(d)(1) is committed to the sound discretion of the bankruptcy court. *In re C&S Grain Co.*, 47 F.3d 233, 238 (7th Cir. 1995) (citing *In re Boomgarden*, 780 F.2d 657, 660 (7th Cir. 1985)). While a lack of adequate protection is the most common basis for granting relief for cause, there are other bases for a cause finding. 3 ALAN N RESNICK & HENRY J. SOMMER, COLLIER ON

BANKRUPTCY ¶ 362.07[3][a] (16th ed. 2011). "[A] court may grant a party relief from the stay if it finds that the moving party's interest in the property can be better protected or for any other cause the court finds to be worthy." *C&S Grain Co.*, 47 F.3d at 238. Cause is not defined by the Bankruptcy Code and is therefore determined on a case-by-case basis by looking at the totality of the circumstances. *In re Tucson Estates*, 912 F.2d 1162, 1166 (9th Cir. 1990).

Section 362(d)(1) does provide that "cause" includes lack of adequate protection. Further, a debtor's inability to timely confirm a plan of reorganization has been held to constitute "cause." *See In re Futures Equity L.L.C.*, No. 00-33682, 2001 Bankr. LEXIS 2229 (Bankr. N.D. Tex. Apr. 11, 2001) (granting relief from the stay for cause where the court found that the debtors had no reasonable prospect of timely confirming a plan of reorganization). Additionally, courts recognize that a debtor's bad faith may constitute cause to terminate the automatic stay. *See In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986). In this matter, Secured Creditor lacks adequate protection, Debtor is unable to timely confirm a plan of reorganization, and various actions by Debtor's insiders evidence bad faith.

### 1. Lack of Adequate Protection

Cause exists to terminate the stay because Secured Creditor is not adequately protected. Pursuant to the Bankruptcy Code, once the movant establishes that the debtor does not have equity in the subject property, the burden on all other issues shifts to the debtor. 11 U.S.C. § 362(g). *See Sun Valley Ranches, Inc. v. Equitable Life Assurance Society of the United States (In re Sun Valley Ranches, Inc.)*, 823 F.2d 1373, 1376 (9th Cir. 1987) (debtor has burden to prove that movant's interest in property at issue is adequately protected).

Debtor admits in its own Disclosure Statement that it has no equity in the Property—the Debtor concedes the Secured Creditor will have a significant deficiency claim. *See* Disclosure Statement at ¶ 4.1 (value of Property is $10 million), ¶ 5.3 (Secured Creditor's secured claim is $14.242 million), and ¶ 5.4 (Secured Creditor's unsecured claim is $4.242 million). As reflected in Secured Creditor's filed proof of claim (Claim No. 5-1) (to which the Debtor has not objected), the total amount due under the Loan is approximately $14,242,985.81. There can be no dispute that the Secured Creditor is undersecured and that the Debtor has no equity in the Property.

The question of adequate protection revolves around the need to compensate a secured creditor for diminution in the value of its security during the pendency of the automatic stay. *See United States Savings Assoc. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988). Adequate protection, of course, is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property. *Id.* at 370.

Section 361 of the Bankruptcy Code provides three examples of the types of adequate protection that can be provided: (a) periodic payments, (b) substitute liens covering the decline, or (c) by some other means that provides the "indubitable equivalent" to compensate for the harm suffered. 11 U.S.C. § 361. In the absence of such adequate protection, a creditor faced with a decline in the value of its interest in the estate's property is entitled to relief from the stay to pursue remedies against the property in which it has an interest. *See, e.g., In re Lodge at Big Sky, LLC*, No. 10-62229, 2011 Bankr. LEXIS 1343, at *15-16 (Bankr. D. Mont. Apr. 8, 2011) (holding that a secured creditor was entitled to adequate protection payments where the debtor had no equity in the property, had not made any payments to the secured creditor and had not paid the real estate taxes on the property in several years); *In re NMP Concord II, LLC*, No. 10-43080, 2010 Bankr. LEXIS 3034, at *10-11 (Bankr. N.D. Cal. Aug. 31, 2010) (granting relief from the automatic stay where there was no equity cushion, the debtor had not made any payments to the secured creditor and there was no evidence of the debtor's ability to offer any replacement lien); *First of America Bank-Illinois, N.A. v. Bannockburn Lake Office Plaza Assoc., L.P. VII*, No. 97 C 6387, 1998 WL 911732 (N.D. Ill. Dec. 23, 1998) (bankruptcy court lifted stay where debtor had no cash flow and would be unable to protect bank's interest in real estate).

In the present situation, the Debtor has no equity in the Property by its own admission. It does not have enough cash on hand to provide adequate protection payments to the Secured Creditor and has not been able to service the Secured Creditor's debt since June of 2009. Total monthly payments on the Secured Creditor's debt, including principal, interest, and the funding of tax, insurance and replacement reserves, are approximately $99,000. The Debtor has no other unencumbered assets that could provide the Secured Creditor with adequate protection. Moreover,

the Debtor is not able to undertake the repairs that are necessary to the roof of the Property. Debtor cannot possibly satisfy its burden of proving Secured Creditor is adequately protected and cause exists to lift the stay.

### 2. Inability to Timely Confirm a Plan of Reorganization

Cause exists to lift the stay because Debtor will not be able to timely confirm a plan. Pursuant to section 1129(a)(10) of the Bankruptcy Code, a court may confirm a plan only if at least one class of claims that is impaired under the plan has accepted the plan. Debtor has proposed a plan that would garner consent from an "impaired" class only through gerrymandering and bad faith.

Debtor's plan purports to divide creditors into 7 classes: (a) Secured Creditor's claim constitutes Class 1; (b) the claims of four lenders who extended credit to Debtor for the purchase of trucks constitute Classes 2 through 5; (c) general unsecured creditor claims constitute Class 6; and (d) Membership Interests constitute Class 7. This division of creditors is an attempt by the Debtor to gerrymander votes in support of its plan and violates the absolute priority rule.

#### a. The Truck Lenders' Claims (Classes 2 through 5) Are Artificially Impaired

Classes 2 through 5 are artificially impaired. Artificial impairment occurs "when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004). Such "impairment" allows a debtor to manipulate the chapter 11 process by engineering compliance with section 1129, while avoiding opposition by truly impaired creditors. *Id.; see also Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.)*, 7 F.3d 127, 130-31 (8th Cir. 1993) (noting that impairment may not be "manufactured at the will of the debtor" and explaining that section 1129(a)(10) is intended to protect secured creditors from debtors who may otherwise "rewrite their credit agreements without their consent").

The first consideration with respect to the truck loans is why the trucks should not be returned and the claims of Ford Motor Credit and GMAC simply treated as general unsecured claims. It is completely unclear why a 126-unit apartment complex requires four trucks. Debtor did not turn over any of the trucks to the Receiver and the Receiver has been operating the property for

9
SECURED CREDITOR'S MOTION FOR RELIEF FROM STAY

many months without the need for any trucks. The trucks have not been used during the pendency of this case by or for the benefit of the Debtor or the operation of its business. Secured Creditor suspects that, in reality, these trucks are for the personal use of the Topols.

The second consideration with respect to the truck loans is their contrived impairment. Debtor's plan proposes to pay each of the truck loans in two years at an interest rate of 6% per annum. The plan indicates that each of the four loans had an original term of five years. Two of these loans essentially have matured, a third loan matures in June 2012, and a fourth matures in July 2013. The two loans that have matured have de minimis balances of approximately $3,000, and interest rates of 1.9% and 0%. Spreading $3,000 out over two years (a payment of $125 a month), with an interest rate that it is at best three times the initial interest rate is a contrived impairment. The two loans that have matured should simply be paid off if the Debtor is to keep the trucks.

The other two loans have balances of approximately $11,000 and $10,000, and interest rates of 1.9% and 5.5% respectively. The third loan matures in one year anyway, and has only a 1.9% interest rate. The treatment thus proposes to extend the maturity date by a year and triple the interest rate; the Debtor will not benefit at all from this treatment; the original terms should be reinstated. The fourth loan matures in two years in any event. The Plan at most will extend payment out by a couple of months, and increases the interest rate from 5.5% to 6%. The impairment is ridiculous. If the fourth truck is retained, the original loan terms should be reinstated. Perhaps most egregiously, the Debtor's Five Year Cash Flow projections attached to the Disclosure Statement as Exhibit C show that the Debtor will have sufficient cash on hand to pay these four loans on their original terms—including the full pay off the two loans that have already matured.

The classification and treatment of the four truck lenders' claims simply is the Debtor's attempt to manufacture a consenting class and should not be permitted. Without these artificially consenting classes, Debtor will be unable to confirm a plan and, therefore, Secured Creditor is entitled to relief from stay. *See In re Washington Assoc.*, 147 B.R. 827, 832 (E.D.N.Y. 1992) (where a debtor could not propose a confirmable plan without improperly classifying creditors, the court granted relief from the stay to the secured creditor).

DM3\1853749.3 R1501/00047

### b.  Class 6 Will Not Accept the Plan

Secured Creditor's deficiency claim will constitute a blocking vote among Class 6, general unsecured creditors. In order for a class to accept a plan, two-thirds in dollar amount and one-half in number of claims within a class must vote to accept it. 11 U.S.C. § 1126(c). To determine if an impaired class has consented to the plan, claims of insiders cannot be included. 11 U.S.C. § 1129(a)(10).

An "insider" includes a (i) general partner in the debtor; (ii) relative of a general partner in or of the debtor, or person in control of the debtor; (iii) partnership in which the debtor is a general partner; or (iv) person in control of the debtor, as well as an "affiliate" of the debtor. 11 U.S.C. § 101(31)(C), (E). Here, upon information and belief, both Nathan Topol and the Tennis Club are insiders. At one point in time, Nathan Topol was the general partner of the Debtor. Nathan Topol is listed in the Statement of Financial Affairs as one of two partners in the Debtor, although the nature and percentage of his interest is not disclosed. (Statement of Financial Affairs, ¶ 21, Docket No. 1.) Nathan Topol also signed the petition and, on information and belief, controls the Debtor. He signed the Use Agreement as the Debtor's general partner, as well as the general partner of the company who leases the tennis facility to the Tennis Club. Secured Creditor believes that Tennis Club is owned and/or controlled by one or more of the Topols and is an affiliate of the Debtor.

The Disclosure Statement lists total unsecured claims of at least $7,310,103 based on scheduled amounts. (Disclosure Statement, ¶ 5.4.) However, $1.39 million of those claims is held by Nathan Topol and approximately $1.6 million is held by the Tennis Club. (Disclosure Statement, ¶ 5.4.) This totals approximately $2.99 million, leaving only $4.32 million held by non-insider claimants, $4.242 million of which the Disclosure Statement lists as being held by the Secured Creditor. (Disclosure Statement, ¶ 5.4.) Thus, there are approximately $77,000 of general unsecured claims held by non-insider claimants other than the deficiency claim of the Secured Creditor. Accordingly, Secured Creditor's deficiency claim, using the numbers in the Debtor's Disclosure Statement, dwarfs the amount of unsecured claims held by other creditors; therefore, Secured Creditor's deficiency claim will constitute a blocking vote among Class 6.

Without Classes 2 through 5 (the truck lender claims) and Class 6 (general unsecured

claims), there can be no consenting impaired class of creditors to support a reorganization. Therefore, relief from stay is appropriate under section 362(d)(1).

### c. Bad Faith Prevents Confirmation of the Plan

Artificial impairment is also evidence of a lack of the good faith required to confirm a plan under section 1129(a)(3). *See In re Dunes Hotel Assocs.*, 188 B.R. 174, 189 (Bankr. D.S.C. 1995) (artificial impairment of de minimis claim held by sole, friendly creditor to procure accepting impaired class constitutes artificial impairment in violation of section 1129(a)(10) and lack of good faith under section 1129(a)(3)); *In re Daly*, 167 B.R. 734, 737 (Bankr. D. Mass. 1994) ("This contrived and artificial impairment can be viewed either as a violation of the requirement of an accepting impaired class, § 1129(a)(10), or as a violation of the requirement that the plan be proposed in good faith, § 1129(a)(3), or as both. Whichever way it is viewed, it prevents confirmation of the plan."). As discussed above, Debtor's plan proposes to classify the claims of four truck lenders into four separate classes and to treat them as impaired without any indication at all as to why they are proper obligations of the Debtor or why the loans should not be reinstated according to their original terms. The "impairment" of these claims is a fallacy. This artificial impairment of claims shows that Debtor cannot meet the requirements of section 1129(a)(3) and, therefore, cannot confirm a plan of reorganization.

### d. The Plan Violates the Absolute Priority Rule and Cannot Be Confirmed

The Secured Creditor has an unsecured claim as is set forth in the Debtor's Disclosure Statement. *See* discussion, *supra*, at III.A.1. According to the Disclosure Statement, Class 6 general unsecured claims receive "a prorata distribution of the Equity Contribution as described in Section 7.1 below." (Disclosure Statement, ¶ 8.2.6.) However, there is no section 7.1 to the Disclosure Statement. Treatment of the Class 7 Membership Interests is as follows: "The members shall retain their membership interests in the Reorganized Debtor, but shall receive no distribution until Classes 1 through 6 are paid in full."[4] (Disclosure Statement, ¶ 8.2.7.) The "Equity Contribution" is defined

---

[4] It is not clear what the means. Does paid in full mean with interest? If so, at what interest rate? If equity is not distributed until Class 6 claims are paid in full, who then will take the equity given the certainty that Class 6 claimants will not be paid in full based on the $50,000 that is being set aside to pay over $7 million in claims?

12
SECURED CREDITOR'S MOTION FOR RELIEF FROM STAY

as "the sum of $75,000, ... of which $50,000 shall be distributed to unsecured creditors as set forth in Section 8.2(G)." (Disclosure Statement, ¶ 8.4.1.) Given the fact that the Disclosure Statement lists $7.3 million of general unsecured claims and a proposed distribution to general unsecured creditors of $50,000, it is clear that Class 6 claimants are not going to be paid in full and there is no basis for the Class 7 membership interests to retain their interests in the Debtor.

The absolute priority rule requires that the Secured Creditor's unsecured claim be paid in full before any recovery can go to interest holders. 11 U.S.C. § 1129(b)(2)(B). While the United States Court of Appeals for the Ninth Circuit does recognize an exception to the absolute priority rule in the instance where equity holders provide the estate with "new value", the Debtor has not met its burden in proving that the proposed consideration is sufficient to satisfy the exception. *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 910-16 (9th Cir. 1993), *cert. granted*, 510 U.S. 1039 (1994), *vaccatur denied and appeal dismissed as moot*, 513 U.S. 18 (1994); *Sun Valley Newspapers v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*, 171 B.R. 71, 77-78 (B.A.P. 9th Cir. 1994). In addition, the Plan does not comport with the guidance of the United States Supreme Court in *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), as the equity of the company has not been exposed to the market and there is no provision for competing bids or plans.

### 3.     Bad Faith is Grounds to Lift the Stay

Numerous courts have found that cause may exist to lift the stay when the debtor has commenced the case in bad faith. *See, e.g., Laguna Assocs. L.P. v. Aetna Casualty & Surety Co. (In re Laguna Assocs. L.P.)*, 30 F.3d 734, 737 (6th Cir. 1994) (collecting cases); *see also Duvar Apt. v. FDIC (In re Duvar Apt.)*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996) (affirming a bankruptcy court decision to lift the stay for cause and explaining that "[t]he existence of bad faith in commencing a bankruptcy case constitutes cause for granting relief from the stay pursuant to § 362(d)"); *In re West Shore Resort Props. III, LLC,* No. 10-51101, 2010 Bankr. LEXIS 5968, at *5-7 (Bankr. D. Nev. Sept. 17, 2010) (lifting the stay in another bankruptcy case involving Nathan and Virginia Topol where, among other things, the debtor had minimal unsecured debt, no employees or ongoing business, no assets other than the property securing the debt and no independent means to service the

indebtedness). What amounts to bad faith for a finding of "cause" on a motion to lift the stay is the same that is required for a motion to dismiss a bankruptcy case under section 1112 of the Bankruptcy Code. *See, e.g., In re Bryan*, 104 B.R. 554 (Bankr. D. Mass. 1989) (setting forth an expanded list of fourteen factors to be considered in assessing bad faith; creditors filed motions to dismiss or lift stay, and case was dismissed). While there is no precise test for determining bad faith, courts look to factors which show "an intent to abuse the judicial process and the purposes of the reorganization provisions." *Barclays-American/Business Credit, Inc. v. Radio WBHP, Inc. (In re Dixie Broadcasting, Inc.*), 871 F.2d 1023, 1027 (11th Cir. 1989) (debtor filed for bankruptcy protection in an effort to avoid a sale agreement; the Eleventh Circuit held that findings of bad faith were supported and found that relief from the automatic stay was appropriate); *see also 15375 Memorial Corp. v. Bepco, L.P. (In re 15375 Memorial Corp.*), 589 F.3d 605, 618 and fn.7 (3d Cir. 2009) (case dismissed where court found no valid bankruptcy purpose and that case was filed primarily as a litigation tactic).

Cause exists to terminate the stay when a debtor files bankruptcy in bad faith. *See* 11 U.S.C. § 362(d). "The existence of good faith depends on an amalgam of factors and not upon a specific fact. The test is whether a debtor is attempting to deter and harass creditors or attempting a speedy, efficient reorganization on a feasible basis." *Marsch v. Marcsch (In re Marsch*), 36 F.3d 825, 828 (9th Cir. 1994); *see also Adelson v. Smith (In re Smith*), 389 B.R. 902, 924 (Bankr. D. Nev. 1998). Once a movant establishes the existence of a genuine issue concerning the debtor's lack of good faith, the debtor then bears the burden of proving good faith by a preponderance of the evidence. *See, e.g., In re Setzer*, 47 B.R. 340, 345 (Bankr. E.D.N.Y. 1985); *In re Yukon Enterprises*, 39 B.R. 919, 921-22 (Bankr. C.D. Cal. 1984).

In determining whether a debtor has filed in bad faith, courts look to whether several of the following factors exist: (i) the debtor has only one asset, (ii) the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditor; (iii) the debtor has few employees; (iv) the property is the subject of a foreclosure suit; (v) the debtor's financial problems are limited to a two-party dispute; (vi) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; and (vii) the

14
SECURED CREDITOR'S MOTION FOR RELIEF FROM STAY

debtor has no ongoing business or employees. *Laguna Assocs.*, 30 F.3d at 738; *In re Club Tower L.P.*, 138 B.R. 307, 309-10 (Bankr. N.D. Ga. 1991) (granting motion to lift stay where there was no going concern to preserve, no employees to protect and little hope of rehabilitation); *In re Bryan*, 104 B.R. 554 (Bankr. D. Mass. 1989) (setting forth an expanded list of fourteen factors to be considered in assessing bad faith; creditors filed motions to dismiss or lift stay, and case was dismissed); *In re Little Creek Dev. Co.*, 779 F.2d 1068, 1072-73 (5th Cir. Tex. 1986). Generally, where a debtor's reorganization effort involves essentially a two-party dispute resolvable in state court, and the filing for relief under the Bankruptcy Code is intended to frustrate the legitimate efforts of creditors to enforce their rights against the debtor, dismissal or lifting the stay is warranted. *See, e.g., In re Ravick Corp.*, 106 B.R. 834, 844-45 (Bankr. D.N.J. 1989) (creditor moved for dismissal, abstention or modification of the stay to allow continuation of state court litigation; dismissal warranted).

The above factors weigh heavily in favor of a finding of bad faith in this case: (i) Debtor has only one significant asset, the Property; (ii) Secured Creditors' liens encumber the Property; (iii) Debtor filed its chapter 11 petition on the eve of a foreclosure sale, having failed to prevent such a sale in state court; (iv) Debtor has minimal, if any, cash flow to sustain a plan of reorganization or make adequate protection payments;[5] (v) there are few non-insider unsecured creditors and their claims total less than $100,000; (vi) there are various indicia that Debtor is acting solely for the benefit of insiders and contrary to the best interests of creditors; and (vii) filing for bankruptcy was Debtor's only means of forestalling the loss of the Property.

There are other indicia of a lack of good faith. Debtor's Schedule F lists an undisputed claim by the Tennis Club, which, upon information and belief, is an insider, in an amount of $1,603,701.00, despite the fact that the Use Agreement only requires the Debtor to pay the Tennis Club $100.00 per month. Debtor's Statement of Financial Affairs lists withdrawals by Nathan Topol in an "unknown amount" between March 2010 and 2011, yet lists undisputed claims by Topol

---

[5] According to the Receiver's most recent report, the Debtor takes in rents of approximately $120,000 per month. Operating expenses equal approximately $40,000 per month, not including real estate taxes of $8,000 a month or non-routine maintenance of $9,000 per month. Expenses do not include other capital expenses, such as the new roof that is necessary, payment of the Secured Creditor's debt, or any type of management fee.

totaling $1,389,592.69 for "entitlement expenses for tentative map and special use permits" and "contributions." Also, while Topol is listed on the Statement of Financial Affairs under "Current Partners, Officers, Directors and Shareholders," the Debtor lists no information regarding the nature of his interest or percentage interest. Preferences and fraudulent conveyance actions are not preserved in the Plan. Cause exists to terminate the stay based on Debtor's bad faith.

### B. Relief From The Automatic Stay Should Be Granted Pursuant To 11 U.S.C. § 362(d)(2)

Pursuant to section 362(d)(2) of the Bankruptcy Code, relief with respect to the stay of an act against property should be granted if the debtor does not have equity in the property and the property is not necessary to an effective reorganization. Once the movant establishes that there is no equity in the collateral "it is the burden of the debtor to establish that the collateral at issue is 'necessary to an effective reorganization.'" *United Savings Assoc. of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375 (1988) (citation omitted; emphasis in original); *see also* 11 U.S.C. § 362(g) (movant has burden of proof on issue of debtor's equity in property; debtor has burden of proof on all other issues). In particular, the debtor must establish that there is "'a reasonable possibility of successful reorganization within a reasonable time.'" *United Savings*, 484 U.S. at 376 (citations omitted).

As discussed, *supra*, at III.A.1., there is no question that Debtor lacks equity in the Property. Accordingly, Debtor must carry its burden to show that the Property is necessary for an effective reorganization. As discussed in section III.A.2., *supra*, Debtor has no ability to successfully reorganize within a reasonable time. Debtor has proposed a plan which could be approved only by the consent of an artificially impaired class (Classes 2 through 5). Because such artificial impairment cannot be used to show support for a plan and because Secured Creditor's deficiency claim would constitute a blocking vote among the non-insider Class 6 general unsecured creditors, Debtor cannot successfully reorganize within a reasonable time. Compounding the inability to obtain the consent of an impaired class, the Plan violates the absolute priority rule. Relief from stay is appropriate under section 362(d)(2).

C.  **Relief From The Automatic Stay Should Be Granted Pursuant To 11 U.S.C. § 362(d)(3)**

If this Court does not immediately terminate the stay pursuant to section 362(d)(2) or (d)(1), Secured Creditor avers that the Debtor's case is a single asset real estate ("SARE") case and that the stay should be automatically terminated, without further action or order, 30 days from the date this Court finds that the Debtor's case is an SARE case. The Bankruptcy Code defines SARE as "real property constituting a single property or project . . . which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental." 11 U.S.C. § 101(51B). It is quite clear that cases involving apartment buildings are considered to be SARE. *Duvar Apt. v. FDIC (In re Duvar Apt.)*, 205 B.R. 196, 198-200 (B.A.P. 9th Cir. 1996) (noting that a case was a SARE case where the debtor's only asset was an apartment building); *In re Sacramento Apt. Holdings, LLC*, No. 10-40200, 2010 Bankr. LEXIS 1285, at *2 (Bankr. N.D. Cal. Apr. 15, 2010) (noting that where the debtor's sole asset was an apartment building, the case was a SARE case); *In re Vienna Park Properties*, 125 B.R. 84 (S.D.N.Y. 1991) (noting that a case was a SARE case where the debtor's only asset was a 300-unit apartment complex); *In re LJH Enters.*, No. 10-34355, 2011 Bankr. LEXIS 633 (Bankr. S.D. Tex. Feb. 11, 2011) (explaining that debtor was a SARE debtor where its primary asset was a 64-unit apartment complex). The Secured Creditor requests a finding that this is a SARE case.

Section 362(d)(3) sets forth specific conditions for relief from stay of an act against SARE. In particular, section 362(d)(3) provides in relevant part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
>
> ...
>
> (3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief ... or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later-

> (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or
>
> (B) the debtor has commenced monthly payments that–
>
>> (i) may, in the debtor's sole discretion, notwithstanding Section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by the real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
>>
>> (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d)(3). The Bankruptcy Appellate Panel for the Ninth Circuit has stated that "relief under § 362(d)(3) is *mandatory* where its provisions are not strictly complied with." *In re CBJ Development, Inc.*, 202 B.R. 467, 470 (9th Cir. BAP 1996) (quoting *In re LDN Corp.*, 191 B.R. 320, 327 (Bankr. E.D. Va. 1996) (emphasis added)); *see also In re Kkemko, Inc.*, 181 B.R. 47, 49 (Bankr. S.D. Ohio 1995) (noting that consequence of not meeting requirements of section 362(d)(3) is that automatic stay "may be lifted without further ado").

Debtor is a SARE Debtor. Debtor's only substantial asset is a single piece of real property (an apartment building) which generates substantially all of the gross income of Debtor. Debtor's plan of reorganization has no reasonable possibility of being confirmed within a reasonable time and Debtor is incapable of proposing a confirmable plan. Additionally, Debtor has failed to make any monthly payments to Secured Creditor. Thus, this case meets the requirements of section 362(d)(3) and the stay should automatically terminate on a day that is 30 days from the date this Court determines that section 362(d)(3) applies without the need or requirement for further order of this Court or for Secured Creditor to take any further action.

### III.  CONCLUSION

Secured Creditor respectfully requests that the Court: (I) (a) enter an order terminating the automatic stay pursuant to 11 U.S.C. §§ 362(d)(1) and (d)(2) to permit Secured Creditor to exercise any and all of its available rights and remedies in and to its collateral and provide therein that,

pursuant to Federal Rule of Bankruptcy Procedure 4001(a)(3), the Court's order take effect immediately and the fourteen (14) day stay period set forth therein expressly not apply, or, alternatively, (b) enter an order finding that the Debtor is subject to the single asset real estate requirements set forth in 11 U.S.C. § 362(d)(3) and that the automatic stay terminates, without the need for further action or order, automatically 30 days from the date of such order; and (II) grant such other relief as is just and proper.

DATED: September 12, 2011

DUANE MORRIS LLP

By: /s/ Holly S. Stoberski
Holly S. Stoberski (SBN 5490)
Attorneys for Secured Creditor
WBCMT 2006-C27 PLUMAS STREET, LLC