PHILLIP K. WANG (CA SBN 186712)
*Admitted Pro Hac Vice*
**DUANE MORRIS LLP**
One Market Plaza
Spear Street Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: (415) 957-3000
Facsimile: (415) 957-3001
E-Mail: pwang@duanemorris.com

ROSANNE CIAMBRONE (ISBN 6199456)
*Admitted Pro Hac Vice*
**DUANE MORRIS LLP**
190 S. LaSalle Street, Suite 3700
Chicago, Illinois 60603
Telephone: (312) 499-6700
Facsimile: (312) 499-6701
E-Mail: rciambrone@duanemorris.com

HOLLY S. STOBERSKI (SBN 5490)
**DUANE MORRIS LLP**
100 North City Parkway, Suite 1560
Las Vegas, NV 89106-4617
Telephone: (702) 868-2600
Facsimile: (702) 385-6862
E-Mail: hstoberski@duanemorris.com

Attorneys for Secured Creditor
WBCMT 2006-C27 PLUMAS STREET, LLC

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA – RENO DIVISION**

| | |
|---|---|
| In re<br><br>TEE INVESTMENT COMPANY, Limited Partnership, dba LAKERIDGE APARTMENTS,<br><br>Debtor. | Case No. 3:11-BK-50615-BTB<br><br>Chapter 11<br><br>**OBJECTION OF SECURED CREDITOR WBCMT 2006-C27 PLUMAS STREET, LLC TO DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT**<br><br>Date:    September 30, 2011<br>Time:    10:00 a.m.<br>Place:    C. Clifton Young Federal Bldg.<br>           300 Booth Street<br>           Courtroom 2, 5th Floor<br>           Reno, NV 89509<br>Judge:    Honorable Bruce T. Beesley |

Secured Creditor WBCMT 2006-C27 Plumas Street, LLC ("*Secured Creditor*") objects as follows to the First Amended Disclosure Statement (Docket No. 59) (the "*Amended Disclosure Statement*") filed by debtor Tee Investment Company ("*Debtor*") in connection with its First Amended Plan of Reorganization (Docket No. 60) (the "*Amended Plan*").

## I. INTRODUCTION.

In its Amended Disclosure Statement, Debtor has failed to cure the deficiencies identified in Secured Creditor's previous objection. Creditors still cannot make an informed vote based on the information (critical portions of which are missing) provided in the Amended Disclosure Statement. Debtor's omissions are particularly inexplicable because many of the same issues were raised – and favorably acknowledged by the Court – in connection with Secured Creditor's successful motion to maintain the pre-petition receiver (the "*Receiver*") as custodian of Debtor's property (Docket No. 14) (the "*Motion To Excuse Turnover By Receiver*"), Secured Creditor's objection to Debtor's prior Disclosure Statement (Docket No. 53), and Secured Creditor's motion for relief from the automatic stay (Docket No. 61). Accordingly, the Court should not (and cannot) approve the Amended Disclosure Statement.

## II. FACTUAL BACKGROUND.

The Debtor filed its Disclosure Statement on May 31, 2011 (Docket No. 44), to which the Secured Creditor objected (Docket No. 53). On September 9, 2011, the Debtor filed the Amended Disclosure Statement and the Amended Plan.[1]

Secured Creditor has a duly perfected and enforceable first priority lien against substantially all of Debtor's property, including the real property and improvements commonly known as Lakeridge Apartments West, 6155 Plumas Street, Reno, Nevada (the "*Property*"). That lien secures the indebtedness under two promissory notes and the associated loan documents, in the original principal amounts of $11,950,000 and $800,000 (collectively, the "*Loan*"). As reflected in Secured Creditor's filed proof of claim (Claim No. 5-1), the total amount due under the Loan is approximately $14,242,985.81. Secured Creditor believes that the fair market value of the Property

---

[1] Because Debtor filed its Amended Disclosure Statement one week after it was due on September 2, Secured Creditor requested, and Debtor granted, a one-week extension of time to file this objection to September 23.

2
SECURED CREDITOR'S OBJECTION TO FIRST AMENDED DISCLOSURE STATEMENT
DM3\1903113.3 R1501/00047

is approximately $12 million, resulting in an estimated deficiency claim of over $2 million.[2]

Among the collateral assigned to Secured Creditor is a Use Agreement ("*Use Agreement*") between Debtor and Lakeridge Tennis Club, Inc. (the "*Tennis Club*") dated June 30, 2006, under which tenants of the Debtor may use the Tennis Club's facilities in exchange for the Debtor's payment to the Tennis Club of $100 per month. As set forth in the Motion To Excuse The Receiver From Turnover, Secured Creditor is informed and believes that Nathan Topol and/or relatives of Mr. Topol have an interest in the Tennis Club. In particular, on page 5 of the Use Agreement, Mr. Topol signs the Use Agreement in his capacity as general partner of the Debtor, while a "Tamari Topol" signs the Use Agreement as president of the Tennis Club.

On February 9, 2011, Secured Creditor caused a Notice of Trustee's Sale to be recorded, which set a non-judicial foreclosure sale of the Property for March 7, 2011 at 11:00 a.m. Debtor filed its voluntary chapter 11 petition on the eve of foreclosure, on March 1, 2011 (the "*Petition Date*"). Before the Petition Date, a state court ordered the Receiver to take over the Property. On March 10, 2011, Secured Creditor filed its Motion To Excuse Turnover By Receiver, which this Court granted on May 11, 2011, permitting the Receiver to continue to manage the Property. That Motion addressed numerous points that illustrated that the Debtor was acting solely for the benefit of insiders. Most of those deficiencies remain uncorrected to this day and were raised in Secured Creditor's objection to Debtor's first Disclosure Statement and Plan as well as its pending motion for relief from the automatic stay. These defects include:

(i) Debtor substituted Nathan Topol as its general partner with a trust, the Nathan and Virginia Topol Trust of April 1, 1985 (the "*Trust*"), without disclosing the transfer to, or obtaining prior consent from, the Secured Creditor. The Amended Disclosure Statement still fails to disclose the substitution and the effect of the unauthorized transfer on the Amended Plan and creditors. Further, on the one hand, Debtor still lists Nathan Topol as one of two partners of the Debtor, but neglects to disclose the nature of his interest in the Debtor or the percentage interest. (Item 21 of the Debtor's SOFA (Current Partners, Officers, Directors and Shareholders).) However, on the other

---

[2] Secured Creditor reserves all rights regarding valuation, and any dollar amounts stated herein are only Secured Creditor's initial estimate, which may be revised based on appraisals, changed circumstances or other factors, or valuations by the Court.

hand, the Amended Disclosure Statement states that the general partner of the Debtor is the Trust. (Amended Disclosure Statement at 4:22-24.) There is no explanation why the SOFA and Amended Disclosure Statement are inconsistent.

(ii)    Debtor omitted the Use Agreement from its Schedules. While the Use Agreement is listed in the Amended Disclosure Statement, Debtor also lists an unsecured claim by the Tennis Club in the amount of $1.603 million, which is contrary to the terms of the Use Agreement. More importantly, Debtor makes no provision for curing any such amount even though it apparently plans to assume the Use Agreement. (Amended Disclosure Statement at p. 9 and Schedule F.) In addition, Debtor fails to disclose the relationship of Nathan Topol and his family to the Tennis Club.

(iii)    Debtor lists significant *withdrawals by* Topol in an "unknown amount" between March 2010 and March 2011. (Statement of Financial Affairs ("*SOFA*") (Withdrawals from a Partnership or Distributions by a Corporation.) Nevertheless, Debtor also lists *undisputed claims that Topol holds against the estate* in the amount of $1,090,235.79 (listed in the Amended Disclosure Statement as a "loan," but in Schedule F as "entitlement expenses for tentative map and special use permits") and $299,356.90 (listed in the Amended Disclosure Statement as a "loan," but in Schedule F as "contributions"). Debtor must reconcile or explain these entries.

(iv)    Other than a possible claim against the Trust, which is not sufficiently described, the Amended Disclosure Statement acknowledges no other possible preferences or fraudulent conveyances, against insiders or otherwise. However, at the meeting of creditors, both the Debtor's representative, Byron Topol, and the Debtor's attorney acknowledged that (a) various transactions with affiliates were omitted from the Debtor's bankruptcy schedules and SOFA, and (b) they had not conducted a thorough analysis of possible fraudulent or preferential transfers. *See* Declaration of Jill H. Penwarden in Support of Motion to Excuse Turnover by Receiver ¶¶ 7-8 (Docket No. 29). Because preferences and fraudulent conveyances are not retained as part of the Amended Plan, Debtor must disclose the various transactions with its affiliates.

All of these are issues that were raised in the Motion to Excuse Turnover from Receiver and the Secured Creditor's Objection to the first Disclosure Statement. On the third pass, they still have not been remedied. *See* Motion to Excuse Receiver from Turnover (Docket No. 14); Reply in

support of Motion To Excuse Receiver From Turnover (Docket No. 28); Objection of Secured Creditor to Debtor's Disclosure Statement (Docket No. 53).

### III. DISCUSSION

#### A. The Disclosure Statement Does Not Contain Adequate Information

A disclosure statement must contain "adequate information," meaning information in sufficient detail that enables a creditor or interest holder belonging to a particular class to make an informed judgment whether to accept or reject the plan. 11 U.S.C. § 1125(a)(1); *In re Diversified Investors Fund XVII*, 91 B.R. 559, 561 (Bankr. C.D. Cal. 1998). Among other things, a disclosure statement typically should: (a) describe assets and their value, (b) describe the debtor's pre- and post-petition financial condition, (c) provide financial information, data, valuations, and/or projections relevant to voting and feasibility, (d) explain risks under the plan, and (e) explain the relationship of the debtor with affiliates. *In re Metrocraft Publishing Services, Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984). Debtor's Amended Disclosure statement does not meet these standards.

##### 1. Debtor's Disclosure of Claims Against Insiders Seems Purposefully Inadequate.

Debtor's liquidation analysis fails to estimate the recovery that could be obtained from Nathan Topol on account of his general partner liability, which is critical. While the Amended Disclosure Statement does note a claim against the Trust, it does not disclose the possible recovery from Nathan Topol individually. (Amended Disclosure Statement at 4:20-23 (stating only that Debtor's *current* general partner is a family trust, and that Nathan and Virginia Topol are limited partners), and at 21:8-12 (disclosing claim against the Trust and providing no significant information about the Trust).)

Debtor likewise has claims against Nathan Topol, and any other insiders who received funds or property while Debtor was insolvent. There are well-established grounds for recovery of dividends made from an insolvent entity, or preferential payments of alleged debts of insiders, or transfers to insiders disguised as debt repayment that in fact were distributions on account of their equity interests. The Amended Disclosure Statement added only a single "potential claim" against

Nathan Topol for recovery of preferential payment in Paragraph 4.2, stating that the amount is "unknown". (Amended Disclosure Statement at 7:15-16.) A footnote states that he received $383,908 and a management fee of $34,500, and that he repaid $201,982. (Disclosure Statement at 7:24-28.) The Amended Disclosure Statement does not detail why Topol received the funds, or why he returned the sums to the estate, or how these sums relate to the very large unsecured claims that he is alleged to hold. The Amended Disclosure Statement does not indicate that any preferences, fraudulent conveyances, or other claims against Topol or any other insider are being retained. At the very least, an expanded discussion of possible claims, including those against Topol or any other insider, is warranted. Any such claims should also be retained for the benefit of the Debtor's estate.

In addition, the descriptions of the claims held by Nathan Topol have conspicuously been changed to "loans" in the Amended Disclosure Statement from their previous descriptions in Schedule F as "entitlement expenses for tentative map and special use permits" ($1.090 million) and "contributions" ($299,356). At a minimum, any claims that Nathan Topol has against the Debtor should be set off against the claims the Debtor holds against him. Regardless, the claims doubtless are more properly characterized as equity contributions of over $1.3 million. Nathan Topol should not receive any distribution at all. None of this is disclosed in the Amended Disclosure Statement. (*See* Amended Disclosure Statement at 10:11-12 (listing Nathan's "loans" without comment).)

### 2. Debtor's Disclosures Concerning The Use Agreement Are Inconsistent and Inadequate.

Debtor's Schedule G omits the valuable Use Agreement between Debtor and its affiliate, the Tennis Club. However, the Amended Disclosure Statement does list the Use Agreement as an executory contract, (Amended Disclosure Statement at 11:3-7), and states that the Debtor intends to assume it (Amended Disclosure Statement at 17:25). The Amended Disclosure Statement does not provide any other information regarding or explanation of the current state of the Use Agreement, any relevant history, or any claims between Debtor and the Tennis Club. Nor does the Debtor address the dichotomy between assuming the Use Agreement and the alleged $1.6 million due to the Tennis Club as a general unsecured claim. Of course, should the Use Agreement be assumed, and should the Debtor owe the Tennis Club $1.6 million for "past due fees" under the Use Agreement,

that amount would have to be cured for the Use Agreement to be assumed. 11 U.S.C. § 365(b). The Projected Monthly Net Income Statements attached as Exhibit C to the Amended Disclosure Statement show quite clearly that the Debtor does not have $1.6 million on hand to do so. Debtor must make these additional disclosures in order for this case to proceed.

### 3.  Debtor Cannot Contrive Consenting Impaired Classes With The Four Trucks.

The Amended Disclosure Statement now discloses the original loan terms for the four trucks. However, this disclosure simply exposes the artificial impairment of these classes (Classes 2 through 5) in order to create a consenting impaired class. First, it is not clear at all why the trucks should not be returned and the claims of Ford Motor Credit and GMAC simply treated as general unsecured claims. It is completely unclear why a 126-unit apartment complex requires four trucks. Debtor did not turn over any of the trucks to the Receiver and the Receiver has been operating the property for many months without the need for any trucks. (*See* Declaration of Terrance S. Daly in Support of Secured Creditor's Motion for Relief from Stay, ¶ 3(Docket No. 65).) The trucks have not been used during the pendency of this case by or for the benefit of the Debtor or the operation of its business and the Amended Disclosure Statement does not disclose this important fact.

Second, once the terms of the original truck loans are reviewed, it is clear they have been artificially impaired. *See* Motion for Relief From Stay at pp. 9-10, which is incorporated herein by reference. Two of the loans have matured and have only de minimus amounts due (approximately $3,000 each). (Amended Disclosure Statement at 21-22.) The other two loans are being impaired in such a way that makes no economic sense for the Debtor and provide no assistance with its monthly cash flow obligations because the original terms are more beneficial to the Debtor. (Amended Disclosure Statement at 8:24-25.) The Debtor's Five-Year Cash Flow projections attached to the Amended Disclosure Statement as Exhibit C show that the Debtor will have sufficient cash on hand to pay these four loans on their original terms—including the full pay off the two loans that have already matured. Debtor must explain and disclose these points in order for creditors to properly vote.

7
SECURED CREDITOR'S OBJECTION TO FIRST AMENDED DISCLOSURE STATEMENT
DM3\1903113.3 R1501/00047

### 4. Ownership of the Debtor Is Not Adequately Disclosed.

The Amended Disclosure Statement still does not adequately disclose ownership of the Debtor. It states that "The general partner of the Debtor is the Nathan and Virginia Topol Trust of April 1, 985, owning 98%. Nathan Topol and Virginia Topol are limited partners owning a total of 2%." (Amended Disclosure Statement at 4:21-24.) The Amended Disclosure Statement does not disclose the beneficiaries of the Trust. Debtor's principal, Nathan Topol, was Debtor's prior general partner at the time when many of its outstanding debts were incurred, including Debtor's obligations to Secured Creditor. Therefore, as Debtor's counsel did not dispute at the hearing on the Motion To Excuse Receiver From Turnover, Nathan Topol is personally liable for those obligations. At some point in time, Nathan Topol was replaced as general partner of the Debtor, without notice to Secured Creditor. The Amended Disclosure Statement fails to disclose the circumstances of this change, when it occurred, and how the transfer affects creditors.

### B. The Amended Plan Is Unconfirmable On Its Face.

It is appropriate to consider confirmation issues at a hearing on the adequacy of a disclosure statement where the plan is unconfirmable. *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (refusing to approve disclosure statement where underlying plan was "patently unconfirmable"); *In re Mahoney Hawkes*, LLP, 289 B.R. 285, 304 (Bankr. D. Mass. 2002) (refusing to approve disclosure statement where debtor would be unable to propose confirmable plan); *In re Silberkraus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) (noting that "[t]here are numerous decisions which hold that where a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan"); *In re Spanish Lake Associates*, 92 B.R. 875, 877 (Bankr. E.D. Mo. 1988) (declining approval of disclosure statement where plan did not comply with section 1129 of Bankruptcy Code). It would be inefficient to proceed with approval of the disclosure statement and balloting in this case as the Debtor's Plan is unconfirmable because of (i) Debtor's inability to obtain a consenting impaired class, both due to its artificial impairment of the four truck claims and due to Secured Creditor's ability to control the class of general unsecured creditors (11 U.S.C. § 1129(a)(10)); (ii) the bad faith of the Debtor (11 U.S.C. § 1129(a)(3)); and (iii) violation of the absolute priority rule (11 U.S.C. §

1129(b)(2)(B)). *See* Motion for Relief From Stay at pp. 11-13, which is incorporated herein by reference. The confirmation issues discussed in the Motion for Relief from Stay will be addressed only briefly here as they are discussed in full in the Motion for Relief From Stay.

  **1.  The Amended Plan Will Not Have an Accepting Impaired Class as Required by Section 1129(a)(10) of the Bankruptcy Code.**

At least one class of impaired creditors must accept the Amended Plan, determined without including the claims of insiders. 11 U.S.C. § 1129(a)(10). The Amended Plan's impaired classes entitled to vote are Classes 2 through 6. Without Classes 2 through 5 (the truck lender claims) and Class 6 (general unsecured claims), there can be no consenting impaired class of creditors to support a reorganization.

Class 6 will not accept the Amended Plan. Secured Creditor's deficiency claim will constitute a blocking vote among Class 6. In order for a class to accept a plan, two-thirds in dollar amount and one-half in number of claims within a class must vote to accept it, 11 U.S.C. § 1126(c), without considering the claims of insiders, 11 U.S.C. § 1129(a)(10). The Disclosure Statement lists total unsecured claims of at least $7,310,103 based on scheduled amounts, $4.242 million of which the Disclosure Statement lists as being held by the Secured Creditor. (Disclosure Statement, ¶ 5.4.) The Debtor will be unable to secure the votes of two-thirds in dollar amount of Class 6 because the Secured Creditor holds approximately 58% of the class as a whole, irrespective of the claims of insiders. And insiders hold a significant portion of the Class 6 Claims: $1.39 million of those claims is held by Nathan Topol and approximately $1.6 million is held by the Tennis Club. (Disclosure Statement, ¶ 5.4.)

Classes 2 through 5 are artificially impaired. Artificial impairment occurs "when a plan imposes an insignificant or de minimis impairment on a class of claims to qualify those claims as impaired." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004). Such "impairment" allows a debtor to manipulate the chapter 11 process by engineering compliance with section 1129, while avoiding opposition by truly impaired creditors. *Id.*; *see also Windsor on the River Assocs. v. Balcor Real Estate Fin. (In re Windsor on the River Assocs.)*, 7 F.3d 127, 130-31 (8th Cir. 1993) (noting that impairment may not be "manufactured at the will of the debtor" and explaining that

section 1129(a)(10) is intended to protect secured creditors from debtors who may otherwise "rewrite their credit agreements without their consent"). The impairment of Classes 2 through 5 is contrived and makes no economic sense for the Debtor. It simply is the Debtor's attempt to manufacture a consenting class and should not be permitted.

Debtor's Amended Plan proposes to pay each of the truck loans in two years at an interest rate of 6% per annum. The Amended Plan indicates that each of the four loans had an original term of five years. Two of these loans essentially have matured, a third loan matures in June 2012, and a fourth matures in July 2013. The two loans that have matured have de minimis balances of approximately $3,000, and interest rates of 1.9% and 0%. Spreading $3,000 out over two years (a payment of $125 a month), with an interest rate that it is at best three times the initial interest rate is a contrived impairment. The two loans that have matured should simply be paid off if the Debtor is to keep the trucks.

The third loan has a balance of $11,000, matures in one year, and has only a 1.9% interest rate. The treatment thus proposes to extend the maturity date by a year and triple the interest rate; the Debtor will not benefit at all from this treatment; the original terms should be reinstated. The fourth loan has a balance of $10,000, matures in two years in any event, and has a 5.5% interest rate. The Amended Plan at most will extend payment out by a couple of months, and increases the interest rate from 5.5% to 6%. The impairment is ridiculous. Perhaps most egregiously, the Debtor's Five-Year Cash Flow projections attached to the Amended Disclosure Statement as Exhibit C show that the Debtor will have sufficient cash on hand to pay these four loans on their original terms— including the full pay-off of the two loans that have already matured. Classes 2 through 5 cannot serve as an accepting impaired class for purposes of section 1129(a)(10) of the Bankruptcy Code.

      2.     **The Artificial Impairment Also Constitutes Bad Faith Under Section 1129(a)(3) of the Bankruptcy Code.**

Artificial impairment is also evidence of a lack of the good faith required to confirm a plan under section 1129(a)(3), constituting an additional basis for the nonconfirmability of the Amended Plan. *See In re Dunes Hotel Assocs.*, 188 B.R. 174, 189 (Bankr. D.S.C. 1995) (artificial impairment of de minimis claim held by sole, friendly creditor to procure accepting impaired class constitutes

artificial impairment in violation of section 1129(a)(10) and lack of good faith under section 1129(a)(3)).

### 3. The Amended Plan Violates the Absolute Priority Rule of Section 1129(b)(2)(B) of the Bankruptcy Code.

The Secured Creditor has a significant unsecured deficiency claim as set forth in the Debtor's Amended Disclosure Statement. The absolute priority rule requires that the Secured Creditor's unsecured claim be paid in full before any recovery can go to interest holders. 11 U.S.C. § 1129(b)(2)(B). Treatment of the Class 7 Membership Interests is as follows: "The members shall retain their membership interests in the Reorganized Debtor, but shall receive no distribution until Classes 1 through 6 are paid in full." (Disclosure Statement, ¶ 8.2.7.) The "Equity Contribution" is defined as "the sum of $75,000, ... of which $50,000 shall be distributed to unsecured creditors as set forth in Section 8.2(G)." (Disclosure Statement, ¶ 8.4.1.) Given the fact that the Disclosure Statement lists $7.3 million of general unsecured claims and a proposed distribution to general unsecured creditors of $50,000, it is clear that Class 6 claimants are not going to be paid in full and there is no basis for the Class 7 membership interests to retain their interests in the Debtor.

While the United States Court of Appeals for the Ninth Circuit does recognize an exception to the absolute priority rule in the instance where equity holders provide the estate with "new value", the Debtor has not met its burden in proving that the proposed consideration is sufficient to satisfy the exception. *Bonner Mall P'ship v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership)*, 2 F.3d 899, 910-16 (9th Cir. 1993), *cert. granted*, 510 U.S. 1039 (1994), *vaccatur denied and appeal dismissed as moot*, 513 U.S. 18 (1994); *Sun Valley Newspapers v. Sun World Corp. (In re Sun Valley Newspapers, Inc.)*, 171 B.R. 71, 77-78 (B.A.P. 9th Cir. 1994). In addition, the Plan does not comport with the guidance of the United States Supreme Court in *Bank of America National Trust and Savings Association v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999), as the equity of the company has not been exposed to the market and there is no provision for competing bids or plans.

## IV. CONCLUSION.

For all of the foregoing reasons, Debtor's Amended Disclosure Statement should not be approved.

DATED: September 23, 2011

Respectfully submitted,

DUANE MORRIS LLP

By: /s/ Phillip K. Wang
Phillip K. Wang
Rosanne Ciambrone
Holly S. Stoberski
Attorneys for Secured Creditor
WBCMT 2006-C27 PLUMAS STREET, LLC

**PROOF OF SERVICE**

1. On September 23, 2011, I served the following documents:

    a. **OBJECTION OF SECURED CREDITOR WBCMT 2006-C27 PLUMAS STREET, LLC TO DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT**

2. I served the above-named document by the following means to the persons listed below:

    a. By electronic transmission through the CM/ECF filing system of the US Bankruptcy Court, District of Nevada, to the parties listed below:

| | |
|---|---|
| Alan R. Smith<br>505 Ridge Street<br>Reno, NV 89501 | U.S. Trustee-RN-11<br>300 Booth Street, Suite 3009<br>Reno, NV 89509 |
| *Debtor's Counsel* | *Trustee* |

Brian R. Irvine
Jones Vargas
100 W. Liberty St., 12th Floor
P.O. Box 281
Reno, NV  89504

*Attorneys for Creditor Jones Vargas*

    b. By U.S. Mail to the parties listed below:

Tee Investment Company, Limited Partnership
dba Lakeridge Apartments
6100 Plumas Street
Reno, NV 89519

*Debtor*

3. I declare under penalty of perjury that the foregoing is true and correct.

SIGNED: September 23, 2011

| | |
|---|---|
| Jana Dailey | /s/ Jana Dailey |
| (Name of Declarant) | (Signature of Declarant) |